UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
v. )          No.:   3:20-CR-8-TAV-JEM-2
)
RAYMOND G. EDWARDS, JR., )
)
Defendant. )

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on defendant's pro se motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A) [Doc. 444] and counseled supplement thereto [Sealed Doc. 447]. The government has responded [Sealed Doc. 450] and defendant has replied [Sealed Doc. 455]. For the reasons set forth more fully below, defendant's motion for compassionate release [Docs. 444, 447] is **GRANTED**.

## I.    Background

On October 4, 2021, defendant pled guilty to conspiracy to distribute 50 grams or more of methamphetamine and 100 kilograms or more of marijuana, in violation of 21 U.S.C. §§ 846, 841(a)(1), 841(b)(1)(A), 841(b)(1)(B) (Count 1) and conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) (Count 11) [Docs. 231, 270]. Defendant was sentenced to 216 months' imprisonment (with credit of 24 months to be applied toward that sentence), to be followed by 5 years of supervised release [Doc. 399]. Defendant is presently scheduled for release on November

2, 2035. Inmate Locator, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited April 27, 2026).

## I.    Legal Standard

A court generally lacks "the authority to change or modify [a sentence, once imposed,] unless such authority is expressly granted by statute." *United States v. Thompson*, 714 F.3d 946, 948 (6th Cir. 2013) (citing *United States v. Curry*, 606 F.3d 323, 326 (6th Cir. 2010)). The First Step Act of 2018's amendment of § 3582(c)(1)(A) revised one such exception. First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018). Prior to the First Step Act, a district court could grant relief under § 3582(c)(1)(A) only on motion of the Director of the Bureau of Prisons. Now a court may modify a defendant's sentence upon a motion by a defendant if the defendant has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or after the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier. 18 U.S.C. § 3582(c)(1)(A).

If the defendant surmounts this preliminary hurdle, the Court may grant a sentence reduction "after considering the factors set forth in § 3553(a) to the extent that they are applicable" if it finds:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

2

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*Id.* Defendant seeks relief under § 3582(c)(1)(A)(i) [Doc. 444; Sealed Doc. 447].

If the exhaustion requirement is satisfied, courts must then follow the statute's three-step test:

> At step one, a court must "find[ ]" whether "extraordinary and compelling reasons warrant" a sentence reduction. At step two, a court must "find[ ]" whether "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." The Commission's policy statement on compassionate release resides in U.S.S.G. § 1B1.13. Thus, if § 1B1.13 is still "applicable," courts must "follow the Commission's instructions in [§ 1B1.13] to determine the prisoner's eligibility for a sentence modification and the extent of the reduction authorized." At step three, "§ 3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case."

*United States v. Jones*, 980 F.3d 1098, 1107–08 (6th Cir. 2020) (internal citations omitted).

In considering a compassionate release motion, "district courts may deny compassionate release motions when any of the three prerequisites listed in § 3582(c)(1)(A) is lacking and do not need to address the others" but must "address all three steps" if granting such a motion. *United States v. Elias*, 984 F.3d 516, 519 (6th Cir. 2021).

## II.    Analysis

### A.    Exhaustion

The Court first examines whether defendant has satisfied § 3582(c)(1)(A)'s exhaustion requirement, which is a mandatory prerequisite to consideration of a compassionate release request on the merits. *United States v. Alam*, 960 F.3d 831, 833–34

3

(6th Cir. 2020). "When 'properly invoked,' mandatory claim-processing rules 'must be enforced.'" *Id.* at 834 (quoting *Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17 (2017)). The only exceptions to such a mandatory claim-processing rule are waiver and forfeiture. *Id.* (citing *United States v. Cotton*, 535 U.S. 625, 630 (2002)).

In this case, the government concedes that the exhaustion requirement has been satisfied [Sealed Doc. 450, p. 2]. Accordingly, the Court will proceed to evaluate defendant's motion per the three-step test explained above.

### B.    Extraordinary and Compelling Reasons

Turning to whether defendant has set forth extraordinary and compelling grounds for relief, the Court first notes that the United States Court of Appeals for the Sixth Circuit previously held that "[i]n cases where incarcerated persons file motions for compassionate release, federal judges may skip step two of the § 3582(c)(1)(A) inquiry and have full discretion to define 'extraordinary and compelling' without consulting the policy statement of § 1B1.13." *United States v. Jones*, 980 F.3d 1098, 1111 (6th Cir. 2020). This was so because the applicable policy statement, United States Sentencing Guideline § 1B1.13, as written at the time, did not contemplate inmate-filed motions for compassionate release, but instead, was limited to circumstances where the Bureau of Prisons filed a motion on an inmate's behalf. *Id.* at 1109–10; *see also* U.S.S.G. § 1B1.13 (2018).

However, the Sentencing Commission amended the policy statement in § 1B1.13, effective November 1, 2023, to encompass inmate-filed motions for compassionate release. U.S.S.G. § 1B1.13 (2023). It thus appears that the Sixth Circuit's prior ruling that § 1B1.13

4

is not an applicable policy statement to inmate-filed motions for compassionate release is no longer consistent with the Guidelines. *See United States v. Nash*, No. 23-3635, 2024 WL 1979067, at *3 (6th Cir. Apr. 30, 2024) (noting the amendment to § 1B1.13 and stating that "prior to [the date of amendment], no guideline policy statement applied to compassionate-release motions brought by defendants, and a district court could deny a defendant-filed motion without reference to any policy statement"); *see also United States v. Ringgold*, No. ELH-17-232, 2023 WL 7410895, at *5–6 (D. Md. Nov. 8, 2023) ("[I]t appears that the Fourth Circuit's conclusion in *McCoy*, 981 F.3d at 281, to the effect that '§ 1B1.13 is not an 'applicable' policy statement,' is no longer consistent with the Guidelines. This is because the Policy Statement is now expressly applicable to defendant-filed motions pursuant to 18 U.S.C. § 3582(c)(1)(A)."). However, "[t]he new policy statement largely preserves the discretion district courts held to consider any extraordinary and compelling reason for release." *United States v. Davis*, No. 3:20-cr-16, 2023 WL 7356579, at *2 (W.D. N.C. Nov. 7, 2023).

As amended, § 1B1.13(b) states that "[e]xtraordinary and compelling reasons exist under any of the following circumstances or a combination thereof," and discusses when the medical circumstances of the defendant, the age of the defendant, the family circumstances of the defendant, the defendant's victimization in custody, and other reasons may constitute extraordinary circumstances. U.S. SENT'G GUIDELINES MANUAL § 1B1.13(b)(1)–(6) (U.S. SENT'G COMM'N 2025).

5

Although defendant raises several grounds as "extraordinary and compelling" grounds for relief under § 1B1.13, because the Court finds that defendant has established an extraordinary and compelling reason for relief under § 1B1.13(b)(1)(A), as discussed in detail *infra*, the Court need not address defendant's other grounds.

Addressing a defendant's medical circumstances, § 1B1.13(b)(1)(A) indicates that extraordinary and compelling reasons for a sentence reduction exist when:

> The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end-of-life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), *end-stage organ disease*, and advanced dementia.

U.S. SENT'G GUIDELINES MANUAL § 1B1.13(b)(1)(A) (emphasis added). "End-stage organ disease is listed as an example of a terminal illness in U.S.S.G. § 1B1.13(b)(1)(A) (2023). Whether a defendant is diminished in his ability to care for himself is not relevant to whether his medical condition qualifies under U.S.S.G. § 1B1.13(b)(1)(A) (2023)." *United States v. Merriweather*, No. 15-cr-40046, 2024 WL 4264253, at *4 (S.D. Ill. Sept. 23, 2024).

There seems to be no dispute amongst the parties that defendant has been diagnosed with cirrhosis of the liver [*See* Doc. 44, pp. 1, 4; Sealed Doc. 447, pp. 5, 7; Sealed Doc. 450, pp. 4–5; Sealed Doc. 455, pp. 3–4; *see also* Sealed Doc. 447-1, p. 216]. Nor does it appear that the parties would dispute whether end-stage liver disease would qualify as an extraordinary and compelling reason for release under § 3582(c)(1)(A). The dispute, rather, arises as to whether defendant's cirrhosis is an "end-stage organ disease" within the

6

meaning of § 1B1.13(b)(1)(A), and, specifically, whether his cirrhosis has progressed to "end-stage" at this juncture.

Defendant alleges that he "has been diagnosed with untreatable stage 4 cirrhosis of the liver—organ failure—and has been given an end-of-life trajectory" [Doc. 444, p. 1]. Defendant alleges that the medical professionals he has visited classified his cirrhosis as "terminal" and/or "end-stage," and that the doctor "explicitly explained that his diagnosis was terminal" [*Id.* at 4]. Defendant states that he was told that he had approximately 18 to 48 months to live [*Id.*]. Further, in the supplement, counsel states that defendant's liver disease is "end stage" [Sealed Doc. 447, pp. 5, 7].

The government, however, argues that defendant cites only a single passing reference in his prison records for the proposition that his cirrhosis is "end-stage," and not the report of any specialist who has evaluated him [Sealed Doc. 450, p. 4]. The government contends that other notes in his medical record indicate that defendant's liver function was "well preserved" and his "liver function tests were within normal limits" [*Id.*]. The government thus contends that the medical records do not corroborate defendant's assertion that his liver cirrhosis is a terminal illness [*Id.* at 5].

Defendant replies that the BOP's own medical records categorize his liver disease as "end stage" [Sealed Doc. 455, p. 3]. Additionally, his lab results from October 2025 include a "MELD" score, which stands for Model for End-Stage Liver Disease, a calculation that would be unnecessary if defendant's medical circumstances did not include "end stage" liver disease [*Id.*]. Defendant argues that, while the medical records reflect

7

that his liver function tests were within normal limits, that result does not mean that his liver is normal, and patients with cirrhosis can have normal liver function tests [*Id.* at 4]. He also notes that his most recent lab results show abnormal results for serum albumin, bilirubin, and prothrombin time, all of which are related to liver function [*Id.*]. Moreover, a recent clinical encounter indicated that his health is declining and his "prognosis is poor" [*Id.* (citing Sealed Doc. 447-1, p. 6)].

The Court notes that the medical record before it, while lengthy, is not particularly detailed regarding the extent of defendant's liver condition. The words "terminal," "end-of-life trajectory," "untreatable," and "stage 4" are not contained in the medical records [*See* Sealed Doc. 447-1; Sealed Doc. 451]. The medical records largely reflect that defendant has been diagnosed with "unspecified cirrhosis of the liver" [*See* Sealed Doc. 447-1, pp. 4, 7, 24, 33, 216, 288, 291, 331]. However, during a BOP medical examination on September 11, 2025, the provider noted that "patient diagnos[ed] with end stage liver disease" [*Id.* at 82]. The government labels this exam note a "passing reference" to defendant's liver disease being "end stage," but provides no explanation for why the BOP provider would include such a designation in defendant's medical records if it was inaccurate. Moreover, there is no contradictory information contained in defendant's medical records, that is to say, there is no indication that defendant's liver disease is, for example, "stage 2" or "early stage." Instead, the only reference the Court has located within the medical records to any "stage" of defendant's disease is this reference to "end stage liver disease" [*See id.*]. Additional details contained in defendant's medical records

further support taking the statement that defendant has "end stage liver disease [*see id.*] at face value. For example, on December 8, 2025, another BOP provider noted that defendant's "prognosis is poor and he is seeing GI regularly for the liver disease" [*Id.* at 6].

Further, defendant's medical records repeatedly reference a diagnosis of ascites in combination with the cirrhosis, and the need for paracentesis [*See e.g.*, Sealed Doc. 447-1, p. 30 (indicating that abdominal CT from May 2025 showed "cirrhotic liver with sequela of portal HTN, splenomegaly, and large volume ascites"); Sealed Doc. 447-1, p. 123 (noting a diagnosis of "[a]lcoholic cirrhosis of liver with ascites" and indicating a plan of to "[w]orkup the liver disease and paracentesis large-volume"); Sealed Doc. 451, p. 2 ("Needs paracentesis for large volume ascites")]. "Ascites form when fluid builds up [in] [the] peritoneal cavity" of the abdomen. *Paracentesis*, CLEVELAND CLINIC, available at https://my.clevelandclinic.org/health/procedures/paracentesis (last viewed Apr. 28, 2026). "Paracentesis is a procedure that drains excess fluid [e.g., ascites] from [a person's] abdomen." *Id.*

Ascites appears to be a symptom of end-stage liver disease. *See Ascites*, AM. LIVER FOUND., https://liverfoundation.org/liver-diseases/complications-of-liver-disease/ascites/ (last visited Apr. 28, 2026) ("[A]scites is a condition caused by advanced cirrhosis"); Naga P. Chalasani, Raj K. Vuppalanchi, and Clayton Spiceland, *Ascites: A Common Problem in People with Cirrhosis*, AM. COLL. OF GASTROENTEROLOGY, available at https://gi.org/topics/ascites/ (last visited Apr. 28, 2026) (""The development of ascites can

9

indicate serious liver disease"); Rahul Kurapati, Shravan Katta, and Maria C. O'Rourke, *Paracentesis*, STATPEARLS PUBL'G, available at https://www.ncbi.nlm.nih.gov/books/NBK435998/ (last visited Apr. 28, 2026) ("Patients with cirrhosis and ascites have an estimated 1-year mortality of 20%"). "Ascites is a landmark in the progression into the decompensated phase of cirrhosis and is associated with a poor prognosis and quality of life; mortality is estimated to be 50% in 2 years." Giulia-Anna Perri, *Ascites in patients with cirrhosis*, 59 CAN. FAM. PHYSICIAN 1297–99 (Dec. 2012), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC3860926/.

Moreover, "[a]t end-stage cirrhosis, ascites causes symptoms including abdominal distention, nausea and vomiting, early satiety, dyspnea, lower-extremity edema, and reduced mobility." *Id.* Of particular note, defendant appears to have developed many of these complications [*See* Sealed Doc. 447-1, pp. 7, 166, 330, 352 (observing that defendant had a distended abdomen at medical exams); *id.* at 41, 127, 294 (noting defendant experiencing nausea and vomiting); *id.* at 30 (stating defendant's "appetite remains poor"); *id.* at 30, 41, 294, 342 (indicating occasional shortness of breath); *id.* at 24, 32, 33, 107, 128, 157, 216, 299, 354 (referencing defendant's edema in both legs); *id.* at 6 (stating defendant's "mobility is declining and he is now wheelchair bound with only being able to take a few steps"). Viewing all of these facts from defendant's medical record together, it appears that those records support the statement that defendant is suffering from end-stage liver disease.

10

The government directs the Court's attention to a portion of defendant's medical record indicating that a nurse practitioner in the hepatology field found that defendant's liver function as "well preserved," indicating that it was "unclear why he would have developed cirrhosis and why the ascites is present" and defendant could "start with conservative treatment" [Sealed Doc. 450, p. 4 (citing Doc. 447-1, p. 353)]. But the Court notes that that this record is from an encounter on July 2, 2025 [Doc. 447-1, p. 353]. And in that same record, the nurse practitioner suggested the "conservative treatment" of "increase[ing] diuretics to see if any improvement," specifically recommending to "increase Aldactone to 150mg and increase Lasix to 60mg daily" and if "still having significant ascites and/or leg edema, would consider diagnostic paracentesis to help determine etiology of the ascites" [Id.]. Consistent with those recommendations, defendant's medical records reflect that, at least as of August 11, 2025, defendant was receiving 150 mg of spironolactone (Aldactone) and 60 mg of furosemide (Lasix) daily [Id. at 28–29, 301]. And that same month, a provider reported that defendant was "not responding to current furosemide/Aldactone combo" [Id. at 126]. Indeed, exam notes from a December 2025 virtual appointment with the same nurse practitioner indicate that, despite the increases to these medications after defendant's July visit, he "report[ed] no change in fluid status after this increase" [Id. at 30, 32]. Thus, despite the recommendation of a "conservative treatment," it appears that the recommended "conservative treatment" has been ineffective in treating defendant's liver disease, which has continued to progress since that July 2025 exam.

11

The government also points to a notation in defendant's medical records that "[h]is liver function tests were within normal limits" during an emergency room visit in October 2025 [Sealed Doc. 450, p. 4 (citing Sealed Doc. 447-1, p. 32)]. Defendant replies that normal liver function tests do not always mean the liver is normal, and, of the routine liver function tests, only serum albumin, bilirubin, and prothrombin time ("PT") provide useful information on how well the liver is functioning [Sealed Doc. 455, p. 4]. And, according to defendant, the most recent lab results available show abnormal results for all three of these numbers [*Id.* (citing Sealed Doc. 447-1, pp. 307–08, 313)].

Labs from the October 2025 emergency room visit reflect a serum albumin level of 3.2g/dL and a total bilirubin level of 1.7 mg/dL [Sealed Doc. 447-1, p. 32]. Normal albumin levels for an adult are 3.5 to 5.5 g/dL. *Albumin Blood Test*, CLEVELAND CLINIC, available at https://my.clevelandclinic.org/health/diagnostics/22390-albumin-blood-test (last visited May 7, 2026). Normal total bilirubin is between 0.2 and 1.3 mg/dL. *Bilirubin Test*, CLEVELAND CLINIC, available at https://my.clevelandclinic.org/health/diagnostics/17845-bilirubin (last visited May 7, 2026). Accordingly, neither defendant's serum albumin nor total bilirubin levels fell within the "normal" ranges at the time of his October 2025 emergency room visit. Additionally, medical records reflect that defendant's PT was "out of range" as of September 16, 2025 [Sealed Doc. 447-1, p. 247]. And lab work in August 2025 also reflected that defendant's serum albumin and PT were both "out of range" [*Id.* at 249].

12

Ultimately, viewing the medical records as a whole, the Court finds sufficient evidence that defendant is suffering from "end stage" liver disease. Accordingly, the Court finds that defendant has established extraordinary and compelling grounds for release under § 1B1.13(b)(1)(A). The Court now turns to the § 3553(a) factors.

### C. Section 3553(a) Factors

Section "3582(c)[(1)(A)] instructs a court to consider any applicable § 3553(a) factors and determine whether, in its discretion, the reduction authorized by [steps one and two] is warranted in whole or in part under the particular circumstances of the case." *United States v. Jones*, 980 F.3d 1098, 1108 (6th Cir. 2020) (internal citations omitted). The "overarching" inquiry under § 3553(a) is whether the sentence imposed is "sufficient, but not greater than necessary, to comply with the purposes" outlined in § 3553(a) paragraph (2). 18 U.S.C. § 3553(a); *see also Pepper v. United States*, 526 U.S. 476, 491 (2011). To this end, § 3553(a) directs the Court to consider the nature and circumstances of the offense, the history and characteristics of the defendant, the need for the sentence imposed, the kinds of sentences available, the applicable guideline range, any pertinent policy statement, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to any victims. 18 U.S.C. § 3553(a).

Considering the § 3553(a) factors in light of defendant's instant motion, the Court, after due consideration, finds that the balance of these factors do not preclude the granting of compassionate release. The Court has considered the nature and circumstances of the defendant's offenses and defendant's history and characteristics, including the defendant's

13

personal characteristics, criminal history, and post-sentencing conduct. The Court has also considered the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant, and to provide the defendant with needed education and training, medical care, or other correctional treatment. The Court has also considered the kinds of sentences available and the sentencing range, the need to avoid unwarranted disparities, and the need to provide restitution to any victims.

The Court recognizes the seriousness of this conduct. However, the Court also notes that defendant has a relatively minor criminal history, with a total criminal history score of zero [Revised Presentence Investigation Report ("RPSR") ¶ 68]. And, since his incarceration, defendant has incurred only three minor disciplinary infractions [Sealed Doc. 447-4]. The Court also notes that, while incarcerated, defendant has completed several hours of educational or vocational courses [Sealed Doc. 447-3, p. 4]. Defendant has also completed a drug education program [*Id.* at 6].

Significantly, the Court also notes that defendant will remain subject to an five-year term of supervised release [*See* Doc. 397]. During this time, he will be required to comply with a number of conditions, including participating in a program for the testing and treatment of drug and/or alcohol abuse. It is imperative that defendant comply with all conditions of supervised release, including remaining drug-free, abstaining from other criminal activity, and complying with all instructions of the probation officer. The Court

14

would impress upon defendant that, failure to comply with the requirements of supervised release may result in revocation of his supervised release and further incarceration.

Ultimately, having considered the relevant § 3553(a) factors and the record before it, the Court finds that these factors support defendant's compassionate release. The exhaustion requirement has been satisfied, an extraordinary and compelling reason exists, and the applicable § 3553(a) factors support compassionate release; therefore, the Court finds compassionate release to be appropriate. Defendant's motion for compassionate release [Doc. 444] is hereby **GRANTED**.

## III. Conclusion

For the reasons set forth more fully above, defendant's motion for compassionate release [Doc. 444] is **GRANTED** and defendant's sentence is **REDUCED** to **time served**. Except as otherwise provided in this order, all provisions of the amended judgment dated April 5, 2022 [Doc. 399] shall remain in effect.

IT IS SO ORDERED.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE